WILLIAM B. GREENOUGH, Atty.-Gen., *ex rel.*, *vs.* BOARD OF POLICE COMMISSIONERS OF THE CITY OF PROVIDENCE.

FEBRUARY 8, 1909.

PRESENT: Dubois, C. J., Blodgett, Johnson, and Parkhurst. JJ.

(1)   *Special Club Licenses.   Intoxicating Liquors.*

Special club licenses for the dispensing of intoxicating liquors, under the provisions of Pub. Laws cap. 1235, passed May 5, 1905, are not subject to the provisions of Pub. Laws cap. 1583, § 1, passed May 22, 1908, providing that "the number of licenses granted (not including druggists' liquor licenses) shall not exceed, in the several cities and towns of the State, one for each five hundred inhabitants as determined by the last census taken under the authority of the United States or of the State of Rhode Island."

(2)   *Construction of Statutes.*

In the absence of statutory enactment to that effect, it is not to be presumed that the legislature intended that the provisions of a statute should be subject to the terms of another statute, if such presumption involves incompatibility, incongruity, or manifest repugnancy.

(3)   *Construction of Statutes.*

Under the well-settled rule, no construction will be adopted which will defeat the evident purpose of a statute; and it is not to be presumed that the legislature intends to permit something to be done by one statute the doing of which it prohibits by another separate statute, while both of said statutes. are co-existent.

CERTIORARI.   Heard on petition for writ, and denied.

DUBOIS, C. J.   This is a petition for a writ of *certiorari,* brought by the Attorney-General, on the relation of certain persons named therein, and in behalf of the inhabitants of the city of Providence in this State, against the persons constituting the board of police commissioners for said city of Providence, and represents "that as such commissioners (they) are duly authorized by law to grant licenses for the sale of spirituous and intoxicating liquors within said city of Providence, by virtue of and in conformity with the statutes made and provided in such cases: namely, Chapter 102 of the General Laws of Rhode Island, section 2, as amended by Chapter 543 of the Public Laws of Rhode Island passed at the January session, A. D. 1898; Chapter 1235 of said laws passed at the May session, A. D. 1905; Chapter 1355 of said laws passed at the January session, A. D. 1906.

"That by and under the provisions of said Chapter 1583 of the Public Laws it is provided that the number of licenses granted (not including druggists' liquor licenses) shall not exceed, in the several cities and towns of the State, one for each five hundred inhabitants as determined by the last census taken under the authority of the United States or the State of Rhode Island.

"That the population of the State of Rhode Island as shown by the last census taken by the said State, and which is the last census taken in said State and which shows the largest number of inhabitants of the city of Providence of any census taken therein, is 198,635.

"That the number of licenses as determined by said census on the basis of one for each five hundred inhabitants of said city is three hundred and ninety-seven (397), and that said

board of commissioners under and by virtue of said statute had authority and jurisdiction to grant and issue licenses for the sale of spirituous and intoxicating liquors to the number of three hundred and ninety-seven (397), and no more.

"That the said Board of Commissioners on, to wit, the 16th day of December, A. D. 1908, granted to John Dwyer a license for the sale of spirituous and intoxicating liquors at, to wit, No. 294 Tockwotton Street, in said City of Providence, and that prior to the granting of said license said Board of Police Commissioners had already granted and issued to various parties licenses for the sale of such liquors to the number of three hundred and ninety-seven (397) and more, and that when said Board granted said license to John Dwyer it was acting beyond its authority and without any jurisdiction in the premises and that its act in granting said license was null and void and said license was illegal and invalid, all which acts and doings appear upon the records of said Board of Police Commissioners relative to the granting of such licenses.

"That this petitioner is informed and believes, that said Board of Commissioners claims to have acted within the scope of its authority and in conformity with the law in granting said licenses on the ground that in determining the number of persons entitled to such licenses under the provisions of said Chapter 1583, licenses granted to Clubs are not to be counted nor reckoned as licenses for the sale of spirituous and intoxicating liquors under said Chapter, and that unless such licenses are included in the number of licenses granted by said Commissioners in said City of Providence they had not when they issued said license to said John Dwyer exceeded the number of three hundred and ninety-seven (397).

"Whereas, your petitioner avers and insists that licenses for the sale of such liquors granted to Clubs are and should be included in the number of licenses which may be issued by said license commissioners under the terms of said statute, and they say that said license to John Dwyer and all other licenses granted and issued by said commissioners in excess of the number of three hundred and ninety-seven (397) including Club licenses are invalid and void, and they pray that a writ

of *certiorari* may issue out of this Honorable Court directed to said William H. Luther, Harold J. Gross, and Walter A. Presbrey directing and commanding them to appear and to· produce their records of licenses for the sale of spirituous and intoxicating liquors granted and issued by them on or after the first day of December, A. D. 1908, before this Honorable Court, and if it shall appear by said records that a license was granted and issued as aforesaid by said Board of Commissioners to said John Dwyer and that other licenses have been issued· by said Commissioners in excess of the number of three hun- dred and ninety-seven (397) including licenses granted and issued by them to Clubs that such action and record of said Board in excess of its authority be quashed and said Board of Commissioners be directed to revoke and recall all such licenses. granted in excess of and since and after the granting of three hundred and ninety-seven (397) licenses as aforesaid."

(1)    This raises the following question for our determination: Are special club licenses issued under Pub. Laws cap. 1235, passed May 5, 1905, subject to the provision of Pub. Laws cap. 1583, § 1, passed May 22, 1908 which reads as follows: "the number ·of licenses granted (not including druggists' liquor licenses) shall not exceed, in the several cities and towns. of the state, one for each five hundred inhabitants as deter- mined by the last census taken under the authority of the United States or the State of Rhode Island."

Public Laws, chapter 1235, passed May 5, 1905, is entitled "An act in addition to Chapter 92 of the General Laws, entitled 'Of the suppression of certain nuisances,'·" and reads as follows:

"SECTION 1.  All buildings, places, or tenements located within any town or city granting liquor licenses under the provisions of Chapter 102 of the General Laws used by any club or other association, whether incorporated or not, for the purpose of selling, distributing, or dispensing intoxicating liquors to its members or others, shall be deemed to be common nuisances; and whoever keeps or maintains, or assists in keeping or maintaining, such a common nuisance, shall be sentenced to pay a fine of not less than one hundred dollars

nor more than one thousand dollars, and all costs of prosecution and conviction: *Provided,* that in any city or town in which liquor licenses are issued, as provided in Chapter 102 of the General Laws, the licensing board may on application therefor, and payment of a license fee of twenty-five dollars, grant or refuse to grant to any club or association a special club license authorizing the selling, distributing, and dispensing of intoxicating liquors by said club or association to its members only, and only upon the premises occupied by it and to be specified and described in said license; which license shall expire at the same time as other licenses granted under the provisions of Chapter 102 of the General Laws, and may be revoked at any time by the licensing board. Upon the conviction of any incorporated club or association, or any officer, member, agent, or employee thereof, under the provisions of this act, the charter of such club or association shall become null and void.

"SEC. 2. This act shall take effect upon the first day of June, A. D. 1905."

Sections 1, 3, and 4 of Pub. Laws cap. 1583, passed May 22, 1908, entitled "An act in amendment of and in addition to Chapter 102 of the General Laws, entitled 'Of the suppression of intemperance,'" reads as follows:

"SECTION 1. Section 2 of Chapter 102 of the General Laws of Rhode Island, as amended by section 1 of Chapter 543 of the Public Laws of Rhode Island, passed at the January session, A. D. 1898, and by Chapter 1355 of the Public Laws of Rhode Island, passed at the January session, A. D. 1906, is hereby amended to read as follows:

"SEC. 2. The town councils of the several towns, and the boards of commissioners as hereinafter provided, may grant or refuse to grant licenses to such citizens resident within this state, for the manufacture or sale of pure spirituous and intoxicating liquors within the limits of such town or city, as they may deem proper: *Provided,* that the number of licenses granted (not including druggists' liquor licenses) shall not exceed, in the several cities and towns of the state, one for each five hundred inhabitants as determined by the last census

taken under the authority of the United States or the State of Rhode Island. Whenever any license for the sale of spirituous or intoxicating liquors shall be granted, the same shall be granted to expire on the first day of December next succeeding the granting of the same, unless revoked as is hereinafter provided, and such citizens resident may obtain at any time, in the discretion of the persons authorized to grant licenses, a license to expire on the first day of December next succeeding the granting of the same, and pay therefor a price which shall be in proportion to the length of time which the said license so granted shall continue in force bears to the price of a license for a year; but no license granted under the provisions of this chapter shall authorize any person to sell any spirituous and intoxicating liquors on Sunday, or on any election day, or on Labor Day, or on Christmas Day, except in licensed taverns when served with food to guests, or to any woman, except as hereinafter provided, or to sell or deliver, or to suffer to be sold or delivered, to any minor, either for his own use, the use of his parents, or of any other person, or to sell to any intoxicated person or to any person of notoriously intemperate habits, or to sell or furnish intoxicating liquors to any person on a pass-book or order on a store, or to receive from any person any goods, wares, merchandise, or provisions in exchange for liquors, or to allow any minor or woman to drink any intoxicating liquors upon the premises, except in licensed taverns or in licensed victualing houses, or to allow any minor or woman to sell or serve intoxicating liquors except in licensed taverns or in licensed victualing-houses. The word "tavern" as used in said Chapter 102 of the General Laws, and in any acts in amendment thereof or in addition thereto, shall be construed to mean houses where the principal business is the furnishing of food and sleeping accommodations. The word "victualing-house" as used in said Chapter 102 of the General Laws, and in any acts in amendment thereof or in addition thereto, shall be construed to mean houses or places where the principal business is the furnishing of food. Before granting a license to any person under the provisions of said chapter, said council or board shall give notice by advertisement for at

least two weeks in some newspaper published in the city or town where the applicant proposes to carry on business, or if there be no newspaper published in said city or town, then in some newspaper published in the county in which such town is located, of the name of the applicant for said license, and the particular location for which the license is requested; and shall give opportunity for remonstrants to be heard before them as to the granting thereof, and no license shall be granted under the said chapter to authorize the sale of any such liquors at any building or place where the owners of the greater part of the land within two hundred feet of such building or place shall file, with the board having jurisdiction to grant licenses, their objection to the granting of such license; nor shall any license be granted for the sale of such liquors in any building or place, except taverns that are licensed on the date of the passage of this act, within two hundred feet, measured by any public traveled way, of the premises of any public or parochial school. Before any license shall be issued under the provisions of this chapter, the person applying therefor shall give bond to the city or town treasurer in the penal sum of one thousand dollars, with at least two sureties satisfactory to said council or board, which sureties shall be residents of this state, or a surety company authorized to do business in this state, as surety, which bond shall be conditioned that the person licensed will not violate or suffer to be violated on any premises under his control any of the provisions of this chapter or of Chapters 92 or 281 of the General Laws of the State of Rhode Island, and for the payment of all costs and damages incurred by any violation of either of said chapters, and he shall also pay for such license to the town or city treasurer the sum hereinafter named, three-fourths thereof for the use of such town or city, and one-fourth to be paid over by the town or city treasurer to the general treasurer for the use of the state.'"   . . .

"SEC. 3.   Section 6 is hereby amended so as to read as follows:

"'SEC. 6.   The fees for licenses shall be as follows:

"'I.   For a license to manufacture or sell at wholesale, not to be drunk on the premises, pure spirituous, intoxicating and

malt liquors, not less than seven hundred dollars nor more than fifteen hundred dollars.

"'II.   For a license to sell pure spirituous, intoxicating and malt liquors at retail only, for all cities and towns having over fifteen thousand inhabitants, not less than four hundred dollars, nor more than one thousand dollars; and for all other towns not less than three hundred dollars, nor more than seven hundred and fifty dollars.

"'A license to manufacture pure liquors shall carry with it the right of sale at wholesale at his manufactory by the manufacturer of all pure liquors manufactured by him.  The sale of liquors in less quantities than two gallons shall constitute a sale by retail, and the sale by the quantity of two gallons or in larger quantities shall constitute a sale by wholesale.'

"SEC. 4.   This act shall take effect on and after the first day of December, A. D. 1908, and all acts and parts of acts inconsistent herewith are hereby repealed."

It becomes apparent from a consideration of the foregoing statutes that there are substantial differences between special club licenses and licenses for the manufacture or sale of pure spirituous and intoxicating liquors.

(2)    In the absence of statutory enactment to that effect, it is not to be presumed that the legislature intended that special club licenses, to be issued under the provisions of said chapter 1235, should be subject to the provisions of said chapter 1583, if such presumption involves incompatibility, incongruity, or manifest repugnancy.   Both chapter 1235 and General Laws chapter 102, as amended, relate to licenses for the sale of liquor; but the former has reference only to special club licenses, while the latter refers not only to licenses for the manufacture and sale of liquor, but also to druggists' liquor licenses.   The special club license may be issued to any club or association, irrespective of the citizenship or alienage of its members, while licenses for the manufacture and sale of liquor may only be granted to citizens resident within this State, and druggists' liquor licenses may be granted to such persons, being residents in this State, as are by law authorized to retail, compound, and dispense medicines and poisons.   The former authorizes the

selling, distributing, and dispensing of intoxicating liquors, by said club or association, to its members only, without restriction as to the purity of the liquor so sold, distributed, or dispensed, while the latter permits the manufacture and sale of *pure* spirituous and intoxicating liquors. It is to be observed, however, that Gen. Laws cap. 151, "Of the assay of liquors," does forbid the sale and keeping for sale of impure or adulterated liquors with a penalty for such violation, and also makes provision for the seizure and forfeiture of impure and adulterated liquors.

The evident purpose of the proviso in Pub. Laws cap. 1583, § 1, is to fix a limit to the number of competitors who may engage in the liquor business—those who may compete for the trade of the public. And presumably it was deemed by the legislature to be a sufficient supply for a reasonable public demand to make provision that, out of the number of distillers, brewers, wholesale liquor dealers, and saloon keepers who might apply for a license, not more than one should be granted for each five hundred of the inhabitants of any city or town wherein liquor lawfully may be sold. There is no similarity whatever between a club and a distillery or brewery, or a wholesale dealer in intoxicating liquors. The difference between a saloon and a clubhouse is the difference between a public and a private house. The former may be entered by any person, irrespective of race, creed, color, or previous condition of servitude. The latter may be entered only by its members and their guests, or by the agents and servants of the club in the course of their employment. The openly avowed purpose of the saloon-keeper is to obtain patronage and increase his business, and he courts publicity almost to the verge of notoriety.

On the other hand, the best clubs are very exclusive, of limited membership, and usually with a large list of persons awaiting admission. While it is possible that a club might be incorporated for the sole purpose of selling, distributing, and dispensing intoxicating liquors to its members, it is highly improbable that corporations would often be formed for that purpose. Clubs are generally constituted for social culture,

and sometimes for scientific, artistic, and social purposes. The sale, distribution, and dispensing of intoxicating liquors to the members of a club is merely an incident in, and not the main purpose of, its existence. Many of them serve food, but that is not the object for which they were incorporated. Many of them supply pool and billiard tables for the use of their members, but that fact does not require them to take out licenses for the keeping of the same or render them liable to the penalties provided in Gen. Laws cap. 104, § 10, for keeping the same without license, unless they are kept "for public use or profit within this state." So some clubs have bowling-alleys, and might have shooting-galleries, for the exercise and entertainment of their members, without license, under existing statutes, so long as they were kept for private use and not for public use and profit. A club may be considered in the light of a large family, united, not, indeed, by ties of blood, but by a community of interest, intellectual and social, and, in the case of unincorporated associations, by community of goods.

The fee for a special club license is fixed at twenty-five dollars, irrespective of the membership of the club, and the license fee goes into the treasury of the city or town which grants the same. There is no provision of law by which the State is entitled to any portion thereof. License fees, under chapter 1583, range from three hundred dollars to one thousand dollars, whereof three-fourths are for the use of the city or town and one-fourth is for the use of the State. If special club licenses can only be granted in the proportion of one for each five hundred inhabitants, as hereinbefore stated, it would be within the bounds of possibility that none but special club licenses might be issued in the city of Providence, in which case three hundred and ninety-seven clubs would exhaust the licensing power of the commissioners; in which event the sum of ninety-nine hundred and twenty-five dollars would enure to the benefit of the city treasury and none of it to the State, while the general public outside of club membership would be cut off from its source of supply.

It is a well-known fact that club membership may have very little to do with the population of the place wherein the clubs

are located. For example, the town of East Providence has become the home of several well-known clubs, among which may be mentioned The Squantum Association, The Pomham Club, The Agawam Hunt Club, and the Wannamoisett Country Club. It is quite likely that these clubs have a membership exceeding one thousand persons, and it is very unlikely that three per cent. of their members are residents of the town.

The object of Pub. Laws Cap. 1235, passed May 5, 1905, appears to be to give to such towns and cities as may be willing to acquire revenue from intoxicating liquors the opportunity to increase the same by the addition of license fees for grants of special club licenses issued to clubs or associations for the purpose of permitting them to use the buildings, places, or tenements occupied by them, within such town or city, for the purpose of selling, distributing, or dispensing intoxicating liquors to their members and upon their premises. This is well termed a special club license, for it does not authorize competition for business with public liquor dealers, and only authorizes sales, etc., to its members, upon its premises. The statute itself is entitled "An act in addition to Chapter 92 of the General Laws entitled 'Of the suppression of certain nuisances,'" and was intentionally made so, for it creates a new class of nuisances, viz., buildings, places, or tenements, in towns and cities wherein liquor licenses are granted, used by clubs or associations for the purpose of selling, etc., intoxicating liquors to their members or others. That the legislature did not intend it to be an amendment of or in addition to Gen. Laws Cap. 102, appears clearly from its title and also from the fact that while said chapter 102 is mentioned three times therein, the references thereto are not of such a character as to suggest the idea that special club licenses are to be covered by the provisions of said chapter 102. The first reference describes the cities and towns wherein the newly deemed nuisances are located. The second reference to said chapter provides that in cities and towns where liquor licenses are issued special club licenses may be issued, and the third reference provides that special club licenses shall expire at the same time as *other* licenses granted under the provisions of

Gen. Laws Cap. 102, and may be revoked at any time by the licensing board.

As the liquor licenses granted under the provisions of Gen. Laws Cap. 102, and its amendments, confer upon the licensees therein named authority to compete for the patronage of the public, the legislature has wisely provided for the safe-guarding of the public by prescribing the conditions upon which the licenses may be granted and enjoyed, and also by providing penalties for the violation of the same. Thus it is made necessary to publish notice of applications for licenses in order that any person may remonstrate against the granting of the licenses, or any of them, if he sees fit. And each applicant is required to give bond, with satisfactory sureties, in the sum of one thousand dollars, with condition not to violate any of the provisions of Gen. Laws cap. 102, 92, or 281 ("Of offences against chastity, morality, and decency"). Nor shall any license be granted for the sale of such liquors in any building or place, except taverns already licensed, within two hundred feet of the premises of any public or parochial school, nor where the owners of the greater part of the land within two hundred feet of such building or place shall file with the board, having jurisdiction to grant licenses, their objection to the granting of such license.

All of these provisions are appropriate in connection with the granting of licenses for the manufacture and sale of liquor to the public, which licenses can be revoked under the provisions of said chapter 102, section 12, which reads as follows: "SEC. 12. If any licensed person shall be convicted of the violation of any of the provisions of this chapter, his bond shall be put in suit by the town or city treasurer of the town or city where such bond is given, and by due process of law the penal sum thereof be recovered for the use of such town or city. If any such licensed person shall permit the house or place where he is licensed to sell liquors under the provisions of this chapter to become disorderly, so as to annoy and disturb the persons inhabiting or residing in the neighborhood thereof, or shall permit any gambling or unlawful gaming to be carried on therein, or shall permit any of the laws of the state to be vio-

lated therein, in addition to any penalties which may be prescribed by statute for such offences, he may be summoned before the said council or commissioners, when he and the witnesses for and against him may be heard; and if it shall be made to appear to the satisfaction of said council or commissioners that such licensed person has violated any of the provisions of this chapter, then said council or commissioners shall revoke his license, and such licensed person shall cease to have any authority thereunder, and shall thereafter be disqualified for holding any of the licenses provided for herein in the state for the period of five years,"—while the special club licenses can be revoked, without notice or hearing, at any time, by the licensing board.

The penalties under the two statutes are different. The penalties under chapter 102 are, for selling without a license, in case of a first offence, $20, costs, and imprisonment for 10 days; and in case of a second conviction, $50, costs and imprisonment for three months; and in case of a third or subsequent conviction, $100, costs and imprisonment for not less than three nor more than six months; and for keeping or suffering to be kept on his premises, $20, and imprisonment for ten days. The penalty for keeping or maintaining a club nuisance is not less than $100 nor more than $1,000, costs, and the nullification of the charter of the club. Other penalties are prescribed, under said chapter 102, for violation of various provisions of said chapter.

The scope of the application of said chapter 102 and of said chapter 1235 are different. The club premises used for such sales are made nuisances only in such towns or cities as grant liquor licenses, and during the time they continue to grant them pursuant to said chapter 102; while said chapter 102 applies to all the cities and towns of the State.

The subject-matters are largely different. Said chapter 102, as above quoted, contains many provisions inconsistent with the maintenance of or licensing of clubs; and to make clubs subject to the numerous provisions of said Chapter 102 would practically nullify said Chapter 1235, and prevent the issuing of club licenses. The building, place, or tenement maintained

by a club or association for the use of its members and guests is essentially a private place; and some clubs, to a greater or less extent, furnish food and drink, and not infrequently sleeping accommodations, for their members and guests. A fully equipped club is available as a home for its members, and in some cases is the only place of residence, or home, of some of its members. It is not a tavern or a victualing-house in any legal sense, as taverns and victualing-houses are public places, and are required to be licensed and regulated as such, while clubs are not.

Said chapter 102 prohibits sales of spirituous liquors on Sunday, election day, Labor Day, and Christmas Day, except in licensed taverns when served with food to guests, and prohibits women and minors drinking the same upon the licensed premises, except in licensed taverns or victualing-houses. Therefore what would be lawful in a tavern or victualing-house would, by the construction claimed in favor of the petition, be unlawful in a club used to some extent for the same purposes.

Section 5 of said chapter 102 provides that "no license shall be issued for the sale of intoxicating liquors in any place, except licensed taverns, where a dwelling-house, or a place used as a dwelling-house, is connected therewith from within such licensed place; and no license shall be granted for the sale of intoxicating liquors in any place, except licensed taverns, to which an entrance shall be allowed other than directly from a public traveled way."

At times it has been found convenient to lease or purchase a commodious dwelling-house for use as a clubhouse, and the same has been used for dwelling-house purposes by members, guests, and to some extent by employees; and the house usually and necessarily has an entrance or entrances other than directly from a public traveled way. These conditions existed in the case of the leading clubs of the State at the time of the enactment of said chapter 1235, and still continue. Furthermore, the premises of most, if not all, other clubs are not confined to the ground floor, so that the entrances thereto are not directly from a public traveled way. It is difficult to imagine that the General Assembly intended that the more opulent clubs could

not obtain licenses for the sale of liquors in their clubhouses, while allowing licenses for clubs of lesser scope; and that only clubs located on the ground floor of a building, and in a part of the building opening directly upon a public traveled way, could be licensed.

Prior to the passage of said chapter 1235, in May, 1905, this court held, in *McAloon* v. *License Commissioners*, 22 R. I. 191, 193 (1900), referring to said section 5, that "if the place in question did not conform to these requirements, the board had no jurisdiction to grant a license. Its action was void."

We also held in *State* v. *Conley*, 22 R. I. 397, 401 (1901), that an entrance, requiring a circuitous or crooked route from the highway to the licensed place was an entrance other than directly from a public traveled way, saying: "The clause of the statute under consideration is commonly known as 'the back-door law.' Its intent is to promote the observance of the laws relating to liquor saloons and to prevent the violation thereof by requiring that entrance to such saloons be under direct public observance from the highway." As to the claim that section 5 prohibited only entrances through other rooms or buildings, we said (pp. 402, 403): "We are of the opinion that the statute includes in its prohibition such entrances also, but that it can not be limited to prohibit such entrances only. As prohibiting entrances through other rooms, buildings, etc., which may have doors successively in a straight line from the street, the language of the statute must be given a secondary meaning—as immediately for directly. A secondary meaning may be included with, but should not be preferred to or exclude, a primary meaning." And we quoted with approval the words of Morton, C. J., in *Commonwealth* v. *Ferden*, 141 Mass. 28, as follows: "The purpose of the Legislature, manifested in this and other provisions of the statute, was that the premises licensed and the entrances to them should be open and exposed to view from the public streets."

Further, section 62 of said chapter 102 provides that "every person licensed to sell intoxicating liquors shall cause to be removed on his licensed premises all obstructions of whatever kind that may prevent a clear view of the interior of the same

from the outside thereof, by the passer-by, through the window, during the entire day of each Sunday." In said case of *State* v. *Conley, supra,* p. 401, we referred to this section as the "screen law," saying: "This section does not expressly provide that the view shall be from the highway, but it implies as much, since the public ordinarily would have no right to pass by saloon windows not opening on a highway."

(3)   In the passage of said chapter 1235, the General Assembly presumably legislated in view of the construction placed by this court upon said chapter 102 and the power to grant licenses thereunder, and it is not to be presumed that the legislature intends to permit something to be done by one statute the doing of which it prohibits by another separate statute, while both of said statutes are coexistent. Under the ordinary well-settled rules of construction of statutes, no construction will be adopted which will defeat the evident purpose of a statute. As we said in *State* v. *Drowne,* 20 R. I. 302, 306, "we are bound to construe a statute in the most beneficial way which its language will permit, in order to prevent inconsistency or injustice," and "such construction will be adopted as shall appear most reasonable, and best suited to accomplish the objects of the statute, and that a construction which leads to an absurdity will be avoided if possible."

Not only is the substance of said chapter 102 materially different from that of said chapter 1235, as might be expected, as the one regards the licensing of a private club or association, and the other contemplates the licensing and regulating of intoxicating liquors to the public generally, but also the terms of said chapter 102 in numerous provisions expressly limit its operation to licenses granted under the provisions of said chapter 102. For instance, in section 2 thereof, as amended by said chapter 1583, the following words are used: "but no license granted under the provisions of this chapter shall authorize any person to sell—"; "before granting a license to any person under the provisions of said chapter—", "before any license shall be issued under the provisions of this chapter—". In section 4 as amended, the following words: "for the sale of intoxicating liquors pursuant to this chapter";

"no license under the provisions of this chapter shall be granted—"; "then licenses under the provision of this chapter shall be granted—."

Special club licenses are issued under the authority of said chapter 1235, and can not be issued under said chapter 102 by reason of the numerous differences hereinbefore specified, and can not reasonably be classed as included in the licenses issued under said chapter 102.

Said chapter 1235 is complete in itself in every essential particular. It contains the prohibition, the penalties for its violation, and the power to license and to revoke the license. It does not contain numerous regulations as to the conduct of clubs having such licenses. This would not be expected in the case of a private club or association.

As to the contention of the petitioner, "that if the General Assembly had intended to limit the operation of chapter 1583 to the statute and amendments thereof recited in section 1 they would not have felt it necessary, and it would not have been necessary, for them to refer to druggists' liquor licenses in order to except them from the number of licenses to be granted under said last mentioned statute."

It is sufficient to observe that the exception, viz.: "not including druggists' liquor licenses," was evidently inserted in the section out of abundant caution. There does not appear to be any necessity for its insertion. While druggists may be citizens, the law does not require that they shall be. The provisions of the statute relating to this subject are contained in Pub. Laws cap. 1223, § 2, passed April 14, 1905, which reads as follows: "SEC. 2. Section 53 of Chapter 102 of the General Laws of Rhode Island is hereby amended so as to read as follows:

"'SEC. 53. The town councils of the several towns and the boards of license commissioners provided for in this chapter may grant or refuse to grant licenses to be known as druggists' liquor licenses, to such persons, being residents of this state, as are by law authorized to retail, compound, and dispense medicines and poisons, for the sale of pure, spirituous, and intoxicating liquors in quantities not to exceed one pint, or

in an original package containing not more than one quart, for medicinal purposes only, and not to be drunk on the premises of the seller. Such licenses may be granted at any time and shall expire on the first day of May next succeeding the granting of the same. The fee for such license shall be twenty-five dollars, and such license shall be subject to the provisions of section eleven of this chapter, and shall state that the liquors are to be sold for medicinal purposes only, and not to be drunk upon the premises."

It thus appears that they must be "persons, being residents of this state;" and it further appears, by reference to Gen. Laws cap. 152, "Of medicines and poisons," that such persons must apply for examination and registration, etc., from which it follows that natural and not artificial persons are intended. Moreover, the statute applies to all the cities and towns of the State, and is not limited to such as permit intoxicating liquors to be sold therein. Furthermore, while it is true that said chapter 1223 is not an amendment of section 2 of Gen. Laws cap. 102, it is in terms an amendment of that chapter.

The foregoing consideration of the subject leads us to the conclusion that a construction which would make said chapter 1235 subject to the provisions of said chapter 1583 would be destructive of the legislative intent as the same is expressed in the aforesaid statutes.

For these reasons the question presented must be answered in the negative.

The prayer of the petition for a writ of *certiorari* is therefore denied and dismissed.

*Nathan W. Littlefield and Chester W. Barrows*, for petitioners.

*Albert A. Baker, City Solicitor, Henry C. Cram, and Elmer S. Chace, Assistant City Solicitors*, for respondents,